**This order is SIGNED.**

**Dated: September 26, 2018**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

---

<table>
<tr><td colspan="2" align="center">IN THE UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF UTAH</td></tr>
<tr>
<td>
In re:<br><br>
MOUNTAIN WEST INDUSTRIES,<br>LLC,<br><br>
           Debtor.<br>
_____
</td>
<td>
Bankruptcy Number: 14-32190<br><br>
Chapter 7
</td>
</tr>
<tr>
<td>
GEORGE B. HOFMANN, in his capacity<br>as Chapter 7 Trustee of Mountain West<br>Industries, LLC,<br><br>
           Plaintiff,<br>
vs.<br><br>
DAMARC QUALITY INSPECTION<br>SERVICES, LLC, and EDWARD D.<br>MANSELL,<br><br>
           Defendants.
</td>
<td>
Adversary Proceeding No. 15-02262<br><br>
Hon. Kevin R. Anderson
</td>
</tr>
<tr><td colspan="2" align="center"><strong>MEMORANDUM DECISION ON DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT (DOCKET NO. 57)</strong></td></tr>
</table>

## I. INTRODUCTION.

This case involves whether an exculpatory clause in a contract shields an inspector from over $1 million in liability arising from a failure to identify a flaw in the design and construction of high-pressure tanker trailers that resulted in a purely economic injury to the Debtor.

On December 15, 2015 George B. Hofmann (the "Trustee"), in his capacity as Chapter 7 Trustee of the Mountain West Industries, LLC bankruptcy case, filed this adversary proceeding against Damarc Quality Inspection Services, LLC ("Damarc") for breach of contract, professional negligence, recovery of fraudulent transfers, and disallowance of Damarc's claims against the bankruptcy estate.[1]

On December 21, 2017, Damarc filed a motion for summary judgment asserting all claims should be dismissed because: (1) Utah law applies to the contracts; (2) the Exculpatory Clause in the contracts at issue exempts Damarc from all liability; (3) Utah's economic loss rule precludes liability for a negligence claim; and (4) Damarc gave reasonably equivalent value for its services to Mountain West Industries, LLC.[2]

In a prior decision, the Court found that Utah law applies to the Trustee's causes of action for breach of contract and professional negligence.[3] On July 31, 2018, the Court held a hearing on Damarc's motion for summary judgment that the exculpatory clause in the parties' contract requires dismissal of these causes of action. Richard C. Terry appeared on behalf of Damarc. William Garbina appeared on behalf of the Trustee.

After taking the matter under advisement, the Court is now prepared to rule.

---

[1] Docket No. 1. The Trustee's complaint also named the design engineer, Edward D. Mansell, as a defendant, but the Trustee has settled with that party.

[2] Docket No. 57.

[3] Docket Nos. 85, 86.

## II.  JURISDICTION AND VENUE.

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(a) & (b) and 157(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(O) as it is a proceeding affecting the liquidation of the assets of the estate. Venue is appropriate in this District under 28 U.S.C. §§ 1408 and 1409, and notice of the hearing was proper.

## III. UNDISPUTED FACTS.

1.      The Debtor, Mountain West Industries, LLC ("Mountain West"), previously manufactured utility and cargo trailers. In 2013, Mountain West sought to expand its product line by constructing three, high-pressure tanker trailers to haul liquid petroleum and anhydrous ammonia on public roads (the "Tanker Trailers").

2.      The Tanker Trailers are subject to design and construction standards established by the American Society of Mechanical Engineers ("ASME"), and specifically the "2010 ASME Boiler and Pressure Vessel Code, Part VIII, Division 1, Rules for Construction of Pressure Vessels" (the "ASME Code").[4]

3.      The Tanker Trailers are also subject to regulations under 49 C.F.R. § 178.337, commonly referred to as "Specification MC-331," which expressly incorporates the ASME requirements, and 49 C.F.R. § 178.320, which, for purposes of the Department of Transportation, defines a "cargo tank" as one constructed and certified under the ASME Code.

4.      The Debtor obtained the required ASME "U" and "R" stamps and an ASME-approved Quality Control Manual that qualified the Debtor to construct the Tanker Trailers.[5]

---

[4] Docket No. 79, Ex. J.

[5] *Id*. at pg. 3; Docket No. 57, Ex. F.

5.      The ASME Code required the Debtor to contract with an Authorized Inspection Agency to perform certain inspection services in connection with the design and construction of the Tanker Trailers.[6]

6.      Damarc is an Authorized Inspection Agency.[7]

7.      The Debtor and Damarc signed essentially identical contracts in 2012 and 2013 titled "Agreement For AIA Third Party Inspection Services" (the "Contract").[8]

8.      Damarc's responsibilities under the Contract are as follows:

> *3. Responsibilities of DAMARC*
>
> *As a party to this Agreement, DAMARC agrees to provide third party inspection services at the shop or field controlled by the company as indicated in the scope of the ASME Certificate as applicable.*

9.      The Contract states the following under the heading "Liability":

> *7. Liability*
>
> *7.1 DAMARC shall not be liable for any loss or damage sustained by any person due to any act of omission or error during the performance of services by DAMARC under the terms of this Agreement.*
>
> *7.2 The company [the Debtor] and DAMARC shall maintain at all times insurance, including workers compensation insurance, sufficient to cover all liability that may result from activities conducted under this Agreement. DAMARC may require proof of such insurance either before undertaking its responsibilities under this Agreement, or at any time thereafter.*

10.     The Contract states the following under the heading "Indemnity": (the Liability and Indemnity provisions of the Contract are collectively referred to as the "Exculpatory Clause"):

> *8. Indemnity*
>
> *8.1 The company [the Debtor] agrees that DAMARC is not liable for any claims, costs, actions, and/or demands arising from this Agreement or the*

---

[6] ASME Code at UG-91 (Docket No. 79, Ex. J).

[7] Docket No. 79 at pg. 3.

[8] Docket No. 57, Ex. A (2013 Contract) & Ex. B (2012 Contract).

> *activities conducted there under, except as provided in 8.2 below. This includes, but is not limited to:*
>
> > *a) Services provided by DAMARC;*
> >
> > *b) Use or misuse by The company [the Debtor] of any certificate, license or imprimatur provided by DAMARC under this Agreement;*
> >
> > *c) Any breach of this Agreement.*
>
> *8.2 The company [the Debtor] shall not be liable for any claims, costs, actions, and/or demands arising from personal injuries or injuries to property suffered by DAMARC employees or contractors in the performance of this Agreement.[9]*

11.    The Contract provided that Damarc would be paid $95 an hour, and the Debtor paid Damarc a total of $18,573.80 for its inspection services.[10]

12.    At the completion of the manufacturing process the Authorized Inspection Agency must sign a "Form U-1 Manufacturer's Data Report for Pressure Vessels" (the "ASME Compliance Certificate").[11]

13.    The ASME Compliance Certificate is a form created by the ASME that must be signed by the Authorized Inspection Agency when the pressure vessel "to the best of his knowledge and belief, is in compliance with all provisions" of the ASME Code.[12]

14.    Damarc signed the ASME Certificate of Compliance.[13]

---

[9] Docket No. 57, Exs. A & B, ¶ 8.

[10] Docket No. 57 at pg. 13, ¶ 37; Docket No. 1, Complaint at ¶ 48a.

[11] ASME Code at UG-90(c)(1)(n) (Docket No. 79, Ex. J).

[12] *Id.*

[13] Docket No. 57, Ex. G. The Court noted on the record that Ex. G is not signed. However, counsel for both parties agreed on the record that there was no dispute that a signed copy exists. Docket No. 95, July 31, 2018 Hearing Recording, 1:31:46 p.m. to 1:33:14 p.m.

15.     The ASME Certificate of Compliance contains the following language, as required by the ASME Code:

> *I, the undersigned, holding a valid commission issued by the National Board of Boiler and Pressure Vessel Inspector . . . have inspected the component described in this Manufacturer's Data Report . . . and state that, to the best of my knowledge and belief, the Manufacturer has constructed this pressure vessel in accordance with ASME BOILER AND PRESSURE VESSEL CODE, Section VIII, Division 1. By signing this certificate neither the Inspector nor his/her employer makes any warranty, expressed or implied, concerning the pressure vessel described in this Manufacturer's Data Report. Furthermore, neither the Inspector nor his/her employer shall be liable in any manner for any personal injury or property damage or a loss of any kind arising from or connected with this inspection.*

16.     It was later determined that the materials and/or construction procedures used for some of the nozzles on the Tanker Trailers failed to comply with the ASME Code (the "Non-Compliant Nozzles").

17.     Because of the Non-Compliant Nozzles, the Tanker Trailers could not be sold by the Debtor, making them essentially worthless.

## IV. ANALYSIS.

### A.  Summary of the Parties' Positions

The Trustee's Complaint seeks to recover damages of $1,155,248.80 based on Damarc's alleged breach of the Contract and professional negligence. There is no claim of fraud or gross negligence against Damarc.

In its motion for summary judgment, Damarc asserts that (1) Utah's economic loss rule restricts the Trustee's remedies to those provided for in the Contract; and (2) the Exculpatory Clause in the Contract shields Damarc from any liability arising from the installation of the Non-Compliant Nozzles on the Tanker Trailers.

In response, the Trustee argues (1) that the Exculpatory Clause is invalid either because its language is too ambiguous to be enforceable, or its enforcement would violate a public interest; or

(2) even if the Exculpatory Clause is enforceable, the Trustee can still pursue the claim for

professional negligence under the independent duty exception to the economic loss rule.

The Court agrees with Damarc and, for the following reasons, grants its motion for

summary judgment.

### B.  Does the Economic Loss Rule Apply?

In Utah, the "economic loss rule is a judicially created doctrine that marks the fundamental

boundary between contract law, which protects expectancy interests created through agreement

between the parties, and tort law, which protects individuals and their property from physical harm

by imposing a duty of reasonable care."[14] "[T]he economic loss rule originated as a way of

'limiting damages in products liability cases where there is no physical injury' or damage to 'other

property' and where there are only 'economic losses.'"[15] Further, it requires that "relief for

defeated economic expectations . . . was to come from the contract itself . . . ."[16] Utah defines the

type of losses covered by the economic loss rule as including:

> Damages for inadequate value, costs of repair and replacement of the defective
> product, or consequent loss of profits – without any claim of personal injury or
> damage to other property . . . as well as "the diminution in the value of the product
> because it is inferior in quality and does not work for the general purposes for which
> it was manufactured and sold."[17]

In this case, the Trustee's causes of action do not arise from a tortious injury to persons or

property. Instead, the claims are ones of pure economic loss because the Tanker Trailers are a

---

[14] *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 242 (Utah 2009) (citation omitted).

[15] *Simantob v. Mullican Flooring, L.P.*, 527 Fed. App'x. 799, 804 (10th Cir. 2013) (citing to *Hermansen v. Tasulis*, 48 P.3d 235, 239 (Utah 2002)).

[16] *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 681 (Utah 2001).

[17] *Maack v. Resource Design & Constr., Inc.*, 875 P.2d 570, 579-80 (Utah Ct. App. 1994) (quoting *2314 Lincoln Park W. Condo. Ass'n. v. Mann, Gin, Ebel & Frazier, LTD.*, 555 N.E.2d 346, 348 (Ill. 1990)), *abrogated on other grounds by Davencourt*, 221 P.3d at 249.

"defective product" of "inferior quality" and do "not work for the general purposes for which [they] were] manufactured."[18]

Indeed, Utah has consistently barred negligence claims under the economic loss rule in the context of construction and design cases.[19] This is because the economic loss rule is "particularly applicable" to construction and design problems because parties "can avoid economic loss" with contracts and are thus "free to adjust their respective obligations to satisfy their mutual expectations."[20] This is the situation before the Court.

In 2008, the Utah Legislature codified the economic loss rule in UTAH CODE ANN. § 78B-4-513.[21] The parties briefed whether this statute applied to the manufacture of the Tanker Trailers.

---

[18] *Davencourt*, 221 P.3d at 242 ("[S]ome torts are expressly designed to remedy pure economic loss (e.g., professional negligence, fraud, and breach of fiduciary duty") (quoting *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000)).

[19] *See American Towers Owners Ass'n., Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1189 (Utah 1996) (economic loss rule barred HOA's negligence claim against architect for problematic design and construction of condominiums); *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669 (Utah 2001) (economic loss rule barred subcontractor's negligence claims against a building's architect and design professionals); *Fennell v. Green*, 77 P.3d 339 (Utah Ct. App. 2003) (economic loss rule barred home buyer's negligence claim against developer and builder arising from a landslide), *abrogated on other grounds by Davencourt*, 221 P.3d at 249.

[20] *American Towers*, 930 P.2d at 1190.

[21] UTAH CODE ANN. § 78B-4-513. Cause of action for defective construction.

(1) Except as provided in Subsection (2), an action for defective design or construction is limited to breach of the contract, whether written or otherwise, including both express and implied warranties.

(2) An action for defective design or construction may include damage to other property or physical personal injury if the damage or injury is caused by the defective design or construction:

(3) For purposes of Subsection (2), property damage does not include:

(a) the failure of construction to function as designed; or

(b) diminution of the value of the constructed property because of the defective design or construction.

(4) Except as provided in Subsections (2) and (6), an action for defective design or construction may be brought only by a person in privity of contract with the original contractor, architect, engineer, or the real estate developer.

(5) If a person in privity of contract sues for defective design or construction under this section, nothing in this section precludes the person from bringing, in the same suit, another cause of action to which the person is entitled based on an intentional or willful breach of a duty existing in law.

(6) Nothing in this section precludes a person from assigning a right under a contract to another person, including to a subsequent owner or a homeowners association.

The statute uses such terms as "architect," "real estate developer," and "homeowners association," which suggest it is limited to real estate projects. However, the statute also contains such terms as "engineer" and "defective design or construction," which could be broad enough to include the construction of the Tanker Trailers. However, the Court need not decide whether UTAH CODE ANN. § 78B-4-513 controls because (1) if it does apply, it favors Damarc's motion for summary judgment, or (2) if it does not apply, Utah case law on the economic loss rule remains applicable.[22]

In summary, the injury at issue is not one to persons or property, but instead involves the purely economic loss arising from the non-compliant construction of the Tanker Trailers. The parties were free to strike a bargain that balanced the cost of services against the risk of loss to satisfy their mutual expectations. The parties memorialized their bargain in the Contract. For these reasons, the Court finds that the economic loss rule applies in determining the remedies available to the Trustee.

1. <u>Does the Independent Duty Exception to the Economic Loss Rule Apply?</u>

The Trustee asserts that even if the economic loss rule applies, he can still pursue his claim for professional negligence under the independent duty exception. This exception is explained as follows:

> Where the economic loss rule is at issue, the initial inquiry becomes whether a duty exists independent of any contractual obligations between the parties. If we find that an independent duty exists under the law, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule. The question of whether a duty exists is a question of law and involves the examination of the legal relationships between the parties, an analysis of the duties created by these relationships, and policy judgments applied to relationships. [23]

---

[22] *Davencourt*, 221 P.3d at 243 (The Utah Supreme Court noted the enactment of UTAH CODE ANN. § 78B-4-513 but held that the "economic loss rule remains in force and should be applied in accordance with our precedent.").

[23] *Davencourt*, 221 P.3d at 244 (citations and internal quotation marks omitted).

Thus, for the Trustee to prevail on this argument, he must establish that Damarc owed the Debtor a duty that is independent of the Contract based on their legal relationship, the duties created by that relationship, and policy judgments applied to such relationship.

### a. The Complaint Does Not Assert a Duty that is Independent of the Contract.

Turning to the facts of this case, the Court notes that the Trustee's Complaint does not assert a duty that is independent of the Contract. The cause of action for professional negligence alleges: "**Pursuant to the DAMARC Contract**, DAMARC as an engineer acting as an authorized inspector owed [the Debtor] a duty to perform engineering services to the standard of care, skill and diligence generally practiced by engineers rendering similar services."[24] The Complaint further alleges that "DAMARC negligently materially breached its obligations **under the Contract**" by approving the design and construction of the Tanker Trailers with the Non-Compliant Nozzles.[25]

The Complaint therefore ties the alleged breach of a professional duty to the Contract. The Contract itself provides that Damarc will perform "third party inspection services at the shop or field controlled by [the Debtor] as indicated in the scope of the ASME Certificate as applicable."[26] Thus, the Contract incorporates the ASME Code in defining the scope of Damarc's duties.

In response to the motion for summary judgment, the Trustee asserted an independent duty under 49 C.F.R. § 178.337, commonly referred to as "Specification MC-331," which expressly incorporates the ASME requirements, and 49 C.F.R. § 178.320, which, for purposes of the Department of Transportation, defines a "cargo tank" as one constructed and certified under the

---

[24] Docket No. 1 at ¶ 51 (emphasis added).

[25] *Id*. at ¶ 53 (emphasis added).

[26] Docket No. 57, Exs. A & B at ¶ 3.

ASME Code.[27] The Trustee also argued that the "provisions of the ASME Code which require [Damarc] to ensure Code Compliance create independent duties."[28]

In short, the Trustee's assertions of an independent duty all tie back to the ASME Code. However, as explained below, because the ASME Code is the subject matter of the Contract, the ASME Code does not create an independent duty.

>    b.  *The Independent Duty Cannot Overlap with the Subject Matter of the Contract.*

Utah law holds that an independent duty cannot overlap with the subject matter of the contract. In *Reighard v. Yates*,[29] the plaintiffs purchased a home with mold damage. In addressing the independent duty exception to the economic loss rule, the Utah Supreme Court held that because the real estate contract expressly addressed the subject of mold and moisture damage, the seller's "duties relating to the house itself arose from and are limited to the contract."[30] The Court explained:

> Whether the economic loss rule applies depends on whether a duty exists independent of any contractual obligations between the parties. However, once there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract. All contract duties, and all breaches of those duties . . . must be enforced pursuant to contract law. The independent duty principle is a means of measuring the reach of the economic loss rule. **When a duty exists that does not overlap with those contemplated in a contract**, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.[31]

The Utah Supreme Court found its ruling to be consistent with its prior case law by noting that "recovery for deficiencies in the *quality* of construction must be defined by reference to that

---

[27] Docket No. 95, July 31, 2018 Hearing Recording at 2:39:55 p.m. to 2:44:04 p.m.

[28] Docket No. 93 at pg. 11.

[29] *Reighard v. Yates*, 285 P.3d 1168 (Utah 2012).

[30] *Id*. at 1178.

[31] *Id*. at 1176-77 (citations and internal quotation marks omitted).

which the parties have agreed upon, i.e., the contract," and that "the economic loss rule is particularly applicable to claims of negligent construction based on the construction industry's use of detailed and comprehensive contracts that form obligations and expectations."[32]

In an analogous case, *Xat.com Ltd. v. Hosting Servs.*, a social media business sued its web hosting service after someone hacked its web site.[33] The parties' contract contained an exculpatory clause. In addressing the economic loss rule, the business asserted that the web hosting service owed it independent duties under U.S. and international web privacy and security standards. The court disagreed that these standards created an independent duty, relying on a Utah case law on this issue:

> When the duty breached overlaps with a duty contemplated by a contract, any breach must be "enforced pursuant to contract law." *Reighard, 2012 UT 45, ¶ 21, 285 P.3d 1168* (quoting *Grynberg v. Questar Pipeline Co., 2003 UT 8, ¶ 43, 70 P.3d 1*). Indeed, the purpose of contract law is to protect "expectancy interests created through agreement between the parties" *Sunridge Dev. Corp. v. RB & G Eng'g, Inc., 2010 UT 6, ¶ 28, 230 P.3d 1000* (citations omitted). Therefore, "[a]ll contract duties, and all breaches of those duties – no matter how intentional – must be enforced pursuant to contract law." *Grynberg, 2003 UT 8, ¶ 43, 70 P.3d 1.*[34]

Turning to the facts of this case, the Court finds that because the Contract incorporates the ASME Code, Damarc's duties under Contract perfectly overlap with its duties under the ASME Code; thus, the ASME Code, or any of the other statutes incorporating the ASME Code, do not

---

[32] *Id.* at 1178 (citations and internal quotation marks omitted; emphasis in original).

[33] *Xat.com Ltd. v. Hosting Servs., Inc.*, No. 1:16-cv-00092-PMW, 2017 U.S. Dist. LEXIS 15672, 2017 WL 449652 (D. Utah Feb. 2, 2017).

[34] *Id.* at *4; *see also Salt Lake City Corp. v. ERM-West, Inc.*, 984 F. Supp. 2d 1156, 1161 (D. Utah 2013) ("[T]he party seeking to maintain a tort claim for purely economic losses must allege the violation of a standard of care that is not coextensive with that contained in the relevant contracts."); *Simantob v. Mullican Flooring, L.P.*, 527 Fed. App'x. 799, 804 (10th Cir. 2013) ("The independent duty of care must be separate from any 'contractual obligations between the parties.'") (citation omitted).

create a duty that is independent of the Contract. Consequently, any alleged breach of a contractual duty by Damarc is controlled by the Contract.

### c.   Utah Takes a Restrictive Approach in Recognizing an Independent Duty.

In addition, the Court notes that the Utah Supreme Court is generally unwilling to expand the concept of an independent duty in the context of the economic loss rule. In *Davencourt*,[35] condominium units were constructed that later developed serious issues from subsidence. The HOA sued the builder for negligence, but the lower court dismissed those claims under the economic loss rule. On appeal, the Court reaffirmed its application of the economic loss rule "[f]or the same reasons this court first adopted and applied the economic loss rule – to promote the obligations and expectations created by contract and to preserve the 'intrinsic differences between tort and contract law' . . . ."[36] The Court then declined to find that Utah's building code created an independent duty because that "statute exists to promote safety, rather than to aid in the recovery of damages."[37] The Court likewise declined to find an independent duty to "act without negligence in the construction of a home."[38] Lastly, the court held that "[i]f a statutory duty is to exist that lies outside the scope of the economic loss rule, we leave it to the decision of the legislature . . . ."[39]

Based on Utah's continued direction that courts should honor the obligations and expectations created by contract, while preserving the dichotomy between tort and contract claims, this Court declines to find that Damarc owed the Debtor a duty that is independent of the Contract.

---

[35] *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234 (Utah 2009).

[36] *Id.* at 243.

[37] *Id.* at 248.

[38] *Id.*

[39] *Id.*

> d. *Damarc's Assertions that the Contract did Not Guarantee Compliance with the ASME Code Does Not Create an Independent Duty.*

The Trustee makes much of Damarc's statement of undisputed fact that the "contract has no provision that guarantees [Damarc] will ensure the vessel is ASME Code compliant."[40] The Trustee asserts that if "the contract does not require compliance with the ASME Code, then code compliance is necessarily an independent duty . . . ."[41] However, the Court does not interpret Damarc's statement of fact as a disavowal of any duty under the ASME Code, but rather as a reaffirmance that an Authorized Inspection Agency is not a guarantor of ASME compliance. This is indeed the case.

By its own terms, the ASME Compliance Certificate signed by Damarc is not a guarantee of ASME compliance:

> The undersigned . . . have inspected the component described in this Manufacturer's Data Report . . . and state that, **to the best of my knowledge and belief**, the Manufacturer has constructed this pressure vessel in accordance with ASME BOILER AND PRESSURE VESSEL CODE, Section VIII, Division 1.[42]

This language is consistent with the ASME Code itself, which describes the duties of the Authorized Inspection Agency as including "signing the Certificate of Inspection on the Manufacturer's Data Report when the vessel, **to the best of his knowledge and belief**, is in compliance with all provisions of this Division."[43]

Of equal significance is an additional exculpatory clause in the ASME Compliance Certificate: "Furthermore, neither the Inspector nor his/her employer shall be liable in any manner for any personal injury or property damage or **a loss of any kind arising from or connected with**

---

[40] Docket No. 57 at pg. 12, ¶ 35.

[41] Docket No. 96 at pg. 2.

[42] Docket No. 57, Ex. G (emphasis added).

[43] Docket No. 79, Ex. J, ASME Code at UG-90(c)(1)(n) (emphasis added).

**this inspection**."[44] This language is part of the required ASME form U-1,[45] and it is consistent with the Exculpatory Clause in the Contract.

Thus, Damarc's statement that the Contract does not guarantee that the Tanker Trailers would comply with the ASME Code does not create an independent duty. Indeed, the Court finds that the Contract and its Exculpatory Clause are in harmony with the ASME Code, which contemplates that an Authorized Inspection Agency, like Damarc, is not liable for economic loss arising from inspections.

> e.  *Utah Code Ann. § 34A-7-102 Does Not Create an Independent Duty.*

The parties have also briefed whether the case of *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*,[46] requires the finding of an independent duty under Utah's Boiler & Pressure Vessel statute found at UTAH CODE ANN. § 34A-7-102, which incorporates the ASME Code as to the design and construction of pressure vessels. In *Air Prods.*, the Pennsylvania federal court found that this statute created an independent duty between an Authorized Inspection Agency and the purchaser of a pressure vessel.

After review, the Court declines to follow *Air Prods.* because it is factually distinguishable and inconsistent with the present state of Utah law on the economic loss rule. In *Air Prods.* the plaintiff purchased pressure vessels from the manufacturer, so there was no contractual relationship between the plaintiff and the Authorized Inspection Agency to provide a remedy. *Air Prods.* predicted that Utah would limit its application of the economic loss rule as articulated in *American Towers*.[47] However in *Davencourt*, decided after *Air Prods.*, the Utah Supreme Court

---

[44] Docket No. 57, Ex. G.

[45] Docket No. 79, Ex. J, ASME Code at pg. 666.

[46] *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 272 F. Supp. 2d 482 (E.D. Pa. 2003).

[47] *Id.* at 492.

reaffirmed the viability of Utah's prior case law on the economic loss rule.[48] Further, *Davencourt* declined to find that a state statute, such as a building code, created a duty that was independent from a construction contract. For these reasons, the holding of *Air Prods.* does not support the finding of an independent duty in this case.

Accordingly, the Court finds that Damarc did not owe the Debtor a duty that was independent of the Contract, and thus any breach of the Contract must be enforced pursuant to contract law.

### C.  Is the Contract's Exculpatory Clause Valid?

Utah allows parties to contractually allocate both risk and loss: "Often described as exculpatory clauses, such provisions relieve one party from the risk of loss or injury in a particular transaction or occurrence and deprive the other party of the right to recover damages for loss or injury . . . [including] for their ordinary negligence."[49] However, a release of liability is not enforceable if: (1) it offends public policy; (2) the activity to which the release applies falls within the public interest exception; or (3) the release is unclear or ambiguous.[50] The Trustee argues the Exculpatory Clause is invalid either because it is ambiguous, or because its enforcement would violate a public interest.

### 1.  Is the Exculpatory Clause Clear and Unequivocal?

When interpreting contracts on summary judgment, the Court must first find that the Contract is an integrated agreement, meaning "a writing or writings constituting a final expression of one or more terms of an agreement."[51] In this case, the Contract states at paragraph 10.6: "This

---

[48] *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 243 (Utah 2009).

[49] *Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 905 (Utah Ct. App. 1995).

[50] *Penunuri v. Sundance Partners, Ltd.*, 301 P.3d 984, 991 (Utah 2013) (citations omitted).

[51] *Daines v. Vincent*, 190 P.3d 1269, 1275 (Utah 2008) (citation omitted).

Agreement is the entire understanding between the Parties with respect to the subject matter hereof and may only be modified by written agreement."[52] Further, there is no evidence of any modification to the Contract – written or otherwise. Thus, the Court finds that the Contract is an integrated agreement.

Utah law provides the following guidance as to the interpretation of a contract on summary judgment:

> If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law. No ambiguity exists where the language of the contract . . . is not susceptible to contrary, tenable interpretations. When the existence of a contract and the identity of its parties are not in issue and when the contract provisions are clear and complete, the meaning of the contract can appropriately be resolved by the court on summary judgment.[53]

Historically, Utah narrowly construed a contractual release, allocation, or avoidance of liability. But in *Freund v. Utah Power & Light Co.*, the Utah Supreme Court adopted the broader "clear and unequivocal test" regarding such provisions – especially in commercial contracts.[54] This test applies equally to pre-injury releases, post-injury releases, and indemnity releases.[55] *Freund* found that language releasing an indemnitee from "**any claims** for damages to property and injury or death" constituted a sufficiently clear and unequivocal expression to release the power company from all liability for all claims, including alleged negligence, arising from an electrocution injury.[56]

---

[52] Docket No. 57, Exs. A & B.

[53] *iDrive Logistics LLC v. IntegraCore LLC*, 2018 UT App 40, ¶36 (Utah Ct. App. 2018) (citations and internal quotation marks omitted).

[54] *Freund v. Utah Power & Light Co.*, 793 P.2d 362, 370 (Utah 1990).

[55] *Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 905 (Utah Ct. App. 1995).

[56] *Freund*, 793 P.2d at 370-71 (emphasis added).

The Trustee asserts the Exculpatory Clause is "beyond comprehension" because paragraph 8.1 provides that Damarc will not be liable for any claims "except as provided in 8.2 below." However, paragraph 8.2 is a release of the Debtor as to liability "from personal injuries or injuries to property suffered by DAMARC employees or contractors in the performance of this Agreement." All parties acknowledge that the "except as provided" language in paragraph 8.1 is not a model of legal drafting. However, while the correlation of paragraph 8.2 to 8.1 may be somewhat unclear as to the Debtor's liability for injuries to Damarc's employees or property,[57] it is the Debtor's release of Damarc in paragraph 8.1 that is at issue.

Further, the Contract contains a second release under paragraph 7 titled "Liability," which states: "DAMARC shall not be liable for any loss or damage sustained by any person due to any act of omission or error during the performance of services by DAMARC under the terms of this Agreement."[58] The Court sees no ambiguity in this broad release of liability.

Applying the standards articulated above, and particularly the fact that the Exculpatory Clause in this case contains the same broad release as in the *Freund* case, the Court cannot find that the language of the Exculpatory Clause is so unclear and equivocal as to be unenforceable. Likewise, the Court cannot find that the Exculpatory Clause is "capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[59] Indeed, the Exculpatory Clause is quite clear that "**DAMARC is not liable for any claims**, costs, actions, and/or demands arising from this Agreement or the activities conducted

---

[57] At best, there is an ambiguity as to the meaning of paragraph 8.2, but even this language is not so linguistically problematic that the Court cannot readily find that paragraph 8.2 provides a concurrent waiver of the Debtor's liability for any injury to Damarc's employees or property.

[58] Docket No. 57, Exs. A & B at ¶ 7.

[59] *Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.*, 94 P.3d 292, 295 (Utah 2004) (citation and internal quotation marks omitted).

there under … [**including**] but not limited to: a) Services provided by DAMARC; … c) **Any breach of this Agreement**."[60]

At oral argument, the Trustee suggested that because the Debtor had not previously constructed pressure vessels, it was unsophisticated in the ways of the ASME requirements and was therefore at a disadvantage in negotiating the Contract.[61] The Court will not consider this as a factor. The Debtor qualified for and obtained its ASME certification to manufacture the Tanker Trailers.[62] Thus, the Debtor is deemed to be knowledgeable in all relevant areas of the ASME Code and the construction of MC-331 pressure vessels. Further, each party has the burden to understand a contract before signing it, and after signing a contract, a party may not assert that they did not understand its import.[63]

Therefore, because the applicable language in the Exculpatory Clause is neither unclear, ambiguous, nor capable of more than one reasonable interpretation, it cannot be invalidated on that ground.

### 2.   Is the Exculpatory Clause Invalid Under the Public Interest Exception?

The Trustee next argues that the Exculpatory Clause is invalid under the public interest exception to Utah's general rule of "permitting people to surrender their rights to recover in tort for the negligence of others."[64] The public interest exception focuses on the nature of the activity in determining whether a pre-injury tort release violates a public interest and thus is unenforceable.

---

[60] Docket No. 57, Exs. A & B at ¶ 8.1 (emphasis added).

[61] Docket No. 95, July 31, 2018 Hearing Recording at 2:24:23 p.m. to 2:26:42 p.m.

[62] See Docket No. 57, Ex. F.

[63] *Russ v. Woodside Homes, Inc.*, 905 P.2d 901, 906 n.1 (Utah Ct. App. 1995).

[64] *Penunuri v. Sundance Partners, Ltd.*, 301 P.3d 984, 991 (Utah 2013) (quoting *Rothstein v. Snowbird Corp.*, 175 P.3d 560, 562 (Utah 2007)).

Utah has adopted the so-called *Tunkl* standard to assist a court in determining when an activity implicates a public interest:

> The attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] [The transaction] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.[65]

Before applying these factors, the Court notes that "*Tunkl's* focus was on whether the service was 'essential' to individual members of the public."[66] Indeed, *Tunkl* involved an injury to an individual during a hospital stay. Further, the Ninth Circuit has observed that the "*Tunkl* court 'clearly had in mind medical, legal, housing, transportation, or similar services which must necessarily be utilized by the general public.'"[67] Consistent therewith, this Court observes that all

---

[65] *Hawkins v. Peart*, 37 P.3d 1062, 1065 n.3 (Utah 2001) (citing *Tunkl v. Regents of the Univ. of Cal.*, 383 P.2d 441, 445-46 (Cal. 1963)), *superseded by statute*, Utah Code Ann. § 78B-4-203(2)(b), *as recognized in Penunuri*, 301 P.3d at 990 n.3.

[66] *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 262 Cal. Rptr. 716, 733 (Cal. Ct. App. 1989).

[67] *Am. Structural Composites, Inc. v. ICBO Evaluation Servs., Inc.*, 220 Fed. App'x. 660, 662 (9th Cir. 2007) (quoting and affirming district court's language in *Am. Structural Composites, Inc. v. Int'l Conf. of Bldg. Officials*, 325 F. Supp. 2d 1148 (D. Nev. 2004)).

of the Utah cases employing *Tunkl's* public interest analysis involve tortious injuries to individual consumers.[68]

In contrast, the case before this Court involves two commercial entities who negotiated a contract for the construction of high-pressure tanker trailers. Further, the damages in this case arise from the installation of Non-Compliant Nozzles on the Tanker Trailers rather than from intentional or negligent injuries to persons or property. The distinction between *Tunkl* and its progeny and the facts of this case inform the Court's analysis of the *Tunkl* factors as they apply to the design, inspection, and manufacturing activity of the Tanker Trailers.

For this reason, the Court finds more relevant guidance from cases that applied *Tunkl* to exculpatory clauses in contracts between commercial entities involving the regulated manufacture of complex and specialized equipment with which the public may interact. Specifically, in *Delta Air Lines, Inc. v. Douglas Aircraft Co.*,[69] Delta contracted with Douglas for the construction of a passenger airliner to provide transportation services to the general public. The contract contained an exculpatory clause that waived all liabilities "whether or not occasioned by Seller's negligence." A pre-service test flight of the aircraft revealed a faulty landing gear, and Delta sued Douglas under the contract. In attempting to avoid the exculpatory clause, Delta argued the *Tunkl* factors and focused on the intended use of the airliner for public transportation. But the court ruled

---

[68] *Hawkins*, 37 P.3d at 1062 (minor child injured during guided horseback ride); *Berry v. Greater Park City Co.*, 171 P.3d 442 (Utah 2007) (skier injured in "skier cross" race); *Pearce v. Utah Athletic Found.*, 179 P.3d 760 (Utah 2008) (adult injured on bobsled ride); *Penunuri v. Sundance Partners, Ltd.*, 301 P.3d 984, 991 (Utah 2013) (adult rider bucked off horse); *Broderick v. Apt. Mgmt. Consultants, L.L.C.*, 279 P.3d 391 (Utah 2012) (apartment tenants who suffered injury to person and property from arsonist fire). *See also K.N. v. Life Time Fitness, Inc.*, 2018 U.S. Dist. LEXIS 48691, 2018 WL 1472483 (D. Utah March 23, 2018) (child injured at gymnasium day-care center); *Dominguez v. United States*, 2018 U.S. Dist. LEXIS 30060, 2018 WL 1135538 (D. N.M. Feb. 26, 2018) (adult injured while repelling down a climbing wall).

[69] *Delta Air Lines, Inc. v. Douglas Aircraft Co.*, 47 Cal. Rptr. 518, 522 (Cal. Ct. App. 1965).

against Delta, noting the "apples-and-oranges" differences between the consumer hospital services

in *Tunkl* and the industrial construction of an airliner:

> [T]he case at bench involves none of the elements of inequality of bargaining on
> which the cited cases, and other recent cases of the same sort, have laid their stress.
> Delta, bargaining for the purchase and delivery of an airplane yet to be built, is
> hardly the painwracked sufferer seeking emergency admission to the hospital
> whose plight secured relief in *Tunkl*; [Delta] was not faced . . . with a "fine print"
> clause not known to it when it signed the contract; and it did not stand as a single
> inexperienced individual purchaser vis-a-vis with a large seller relatively
> indifferent to the making or not making of a single purchase.[70]

In *Appalachian Ins. Co. v. McDonnell Douglas Corp.*,[71] Western Union purchased a rocket

from McDonnell Douglas to launch a telecommunications satellite into orbit. The contract

contained an exculpatory clause. The rocket motor malfunctioned, and the satellite failed to reach

its required orbit. Western Union's insurance company sued McDonnell Douglas. Citing to *Tunkl*,

the insurance company argued that the exculpatory clause implicated the public interest based on

the public's use of telecommunication satellites. Again, the court disagreed:

> We conclude, the exculpatory clauses here do not conflict with the public interest,
> but were the result of private, voluntary transactions in which one party, for a
> consideration, agrees to shoulder a risk which the law would otherwise have placed
> upon the other party.
> ….
> Each of these theories [public interest and unconscionability] might be asserted in
> *any* action involving an allocation of risk, yet, as discussed, **contractual
> allocations of risk in nonconsumer commercial settings are routinely upheld**.[72]

In support of his argument, the Trustee emphasizes that the purpose of requiring Tanker

Trailers to comply with the ASME Code and Specification MC-331 is "is to protect against the

risks to life, property, and the environment that are inherent in the transportation of hazardous

---

[70] *Id.* at 523.

[71] *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 262 Cal. Rptr. 716 (Cal. Ct. App. 1989).

[72] *Id.* at 734 (citations omitted, emphasis added).

material in intrastate, interstate, and foreign commerce."[73] This is undisputed. But just like the

faulty landing gear in *Delta* or the malfunctioning rocket in *Appalachian*, the issue before the Court

is not the impact of the Non-Compliant Nozzles on the general public, but rather the validity of

the Exculpatory Clause in a mutually-negotiated contract between two commercial entities

regarding the manufacture of specialized hardware that turned out to be defective. Clearly if the

Non-Compliant Nozzles had caused injury to the general public, both the Debtor and Damarc

would be dealing with a different set of issues.

Despite the fact that the *Tunkl* factors appear less relevant to commercial cases with

exculpatory clauses that involve a breach of contract in the construction of complex equipment,

rather than a tort injury to individuals or property, the Court will nonetheless address each *Tunkl*

factor in turn.

    a.  *Tunkl Factor 1: Whether the transaction concerns a business of a type generally
thought suitable for public regulation.*

It is undisputed that the construction of Tanker Trailers is subject to significant regulation

to prevent injury to persons, property, and the environment. But as noted by *Appalachian* and

*Delta Air Lines*, the focus of the "'public regulations' factor is whether the exculpatory clause will

adversely affect a public interest demonstrated by the presence of regulations."[74] Here, the

Exculpatory Clause in the Contract does not impinge on the public's protection rights. As reasoned

in *Delta Air Lines*:

> The fact that Delta is a regulated enterprise and carries passengers has no relevance
> to the present decision. The upholding of the exculpatory clause will not adversely
> affect rights of future passengers. They are not parties to the contract and their rights
> would not be compromised. They retain their right to bring a direct action against
> Douglas for negligence. Also, their right to bring an action against Douglas for

---

[73] Docket No. 79 at pg. 38 (citing 49 U.S.C. § 5101).

[74] *Appalachian*, 262 Cal. Rptr. at 732; *see also Delta Air Lines*, 47 Cal. Rptr. at 523.

breach of implied warranty would not be interfered with because the passengers were not a party to the contract containing the exculpatory clause.[75]

This factor favors Damarc.

    b. *Tunkl Factor 2: Whether the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.*

The Trustee argues that it is of great importance to the public that only ASME-compliant pressure vessels are on the public roadways. The Court agrees, but this is not the relevant focus: "This factor looks to services such as medical, legal, housing, transportation or similar services which must *necessarily* be used by the general public."[76] As noted in *Appalachian*, "the provision of space hardware and launch services is of practical necessity to no individual member of the public; it is of 'practical necessity' only to a few, very large commercial and governmental entities dealing in highly specialized fields such as telecommunications."[77] Likewise, the construction of Tanker Trailers is of practical necessity to no individual member of the public. It is only of practical necessity to the relatively few ASME-certified manufacturers of Specification MC-331 tanker trailers. Therefore, this factor favors Damarc.

    c. *Tunkl Factor 3: Whether the party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.*

The Trustee asserts that Damarc will perform its services for anyone willing to pay for them. The Trustee's statement is correct but overbroad in that only ASME-qualified manufacturers of pressure vessels have need of Damarc's inspection services. As noted by the New Mexico federal court, this "factor was designed to recognize a distinction between sellers who have a 'duty

---

[75] *Delta Air Lines, Inc.*, 47 Cal. Rptr. at 524; *see also Appalachian*, 262 Cal. Rptr. at 732-33 (exculpatory clause did not impair public's rights regarding access to satellite transmissions).

[76] *Appalachian*, 262 Cal. Rptr. at 733 (citations omitted; emphasis in original).

[77] *Id.* at 733.

to serve' all members of the public who seek their services (and who are generally prohibited from enforcing liability waivers), from sellers whose specialized services are limited to persons and entities within that specialization."[78] In this case, Damarc's services are only relevant to ASME-certified manufacturers. This relatively small pool of qualifying entities cannot reasonably be considered the "general public." The Court is again guided by the general observation that *Tunkl* is best suited to fact patterns involving individuals who sign releases and then are injured in an activity "such as medical, legal, housing, transportation or similar services 'which must necessarily be used by the general public.'"[79] This factor favors Damarc.

> d.  *Tunkl Factor 4: Whether, as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks its services.*

The Trustee argues that the ASME Code required the Debtor to use an authorized inspector. While this is correct, the construction of an MC-331 tanker was not an "essential service" as this term is used in *Tunkl*. As noted in *Appalachian* relating to the construction of a rocket:

> [This service] was not the kind of "essential" service referred to by the Supreme Court in *Tunkl. Tunkl's* focus was on whether the service was "essential" to individual members of the public. Here, the service is "essential" only to a small number of large corporations and governmental entities; it "is not a compelled, essential service" but "a voluntary relationship between the parties."[80]

---

[78] *Dominguez v. United States*, 2018 U.S. Dist. LEXIS 30060, 2018 WL 1135538, at *10 (D. N.M. Feb. 26, 2018) (person injured at rock-climbing wall) (citations omitted); *see also Am. Structural Composites, Inc. v. Int'l Conference of Bldg. Officials*, 325 F. Supp. 2d 1148, 1151 (D. Nev. 2004) (third Tunkl factor does not apply to liability waivers in favor of companies whose services are not available to the general public, and are used only by select private companies or specialized commercial entities); *Levin v. Airgas Sw., Inc.*, No. Civ. 05-629 JB/WDS, 2006 U.S. Dist. LEXIS 27273, 2006 WL 1305040, at *16 (D. N.M. Apr. 30, 2006) (Tunkl's third factor favored enforcement of exculpatory clause because the product at issue – liquid nitrogen – was only sold to medical providers and not to the general public).

[79] *Appalachian*, 262 Cal. Rptr. at 733 (citations omitted).

[80] *Id.* (citations omitted).

Here, the Debtor voluntarily took on the additional task of manufacturing the Tanker Trailers. Thus, it was not a compelled, essential service, but involved a voluntary relationship between itself and Damarc. Also, there is no allegation that Damarc possessed "a decisive advantage of bargaining strength." The Debtor was not required to use Damarc as its authorized inspector. It could have sought proposals from any of the other ASME-authorized inspectors if it wanted to avoid the effect of the Exculpatory Clause. Thus, this factor favors Damarc.

> e. *Tunkl Factor 5*: *Whether, in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.*

The Trustee argues that given the "paucity of AI firms in existence" that Damarc held "a decisive advantage of bargaining strength."[81] The Court disagrees. In *Delta Airlines*, the airline likewise argued that because the contract contained a standard exculpatory clause, it "took on an element of a 'contract of adhesion.'"[82] The California appellate court rejected that argument based on the commercial nature of the transaction noting that the airline "did not stand as a single inexperienced individual purchaser vis-a-vis with a large seller relatively indifferent to the making or not making of a single purchase."[83]

Likewise, in the case of *Mullan v. Quickie Aircraft Corp.*, the plaintiff purchased a kit aircraft that crashed on takeoff. The purchase contract contained an exculpatory clause that the plaintiff argued was a contract of adhesion.[84] The Tenth Circuit described an adhesion contract as one not bargained for but "imposed on the public for a necessary service on a take-it-or-leave-it

---

[81] Docket No. 93 at pg. 8.

[82] *Delta Air Lines*, 47 Cal. Rptr. at 523.

[83] *Id.*

[84] *Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845 (10th Cir. 1986).

basis."[85] To find an adhesion contract, "[t]here must be a showing 'that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation or that [the] services could not be obtained elsewhere.'"[86] Based on the specialized nature of the purchase and that the aircraft was built by the plaintiff, the Tenth Circuit found that the purchase agreement was not an adhesion contract, and that the defendant "did not owe a duty to the public in the sense" described in *Tunkl*.[87]

Therefore, the Court finds that this case does not involve an adhesion contact to which the Debtor had no choice or input as to its provisions. As noted above, the Debtor could have negotiated as to the Exculpatory Clause, sought to contract with another ASME-authorized inspector, or declined to construct Specification MC-331 tanker trailers. This factor favors Damarc.

> f.   *Tunkl Factor 6: Whether, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.*

The Trustee argues that the Debtor "'was under the control' of Damarc" and "thus subject to the risk of Damarc's carelessness."[88] This statement is only partially correct. As the Authorized Inspector, Damarc could mandate certain changes to the Debtor's designs and construction processes, but Damarc did not have any part in the physical installation of the Non-Compliant Nozzles. The construction of the Tanker Trailers was pursuant to the Debtor's Quality Control Manual, the Debtor's Quality Control Manager, and the Debtor's employees. While Damarc may bear some fault for the Non-Compliant Nozzles, the primary responsibility to ensure compliance

---

[85] *Id*. at 851 (quoting *Jones v. Dressel*, 623 P.2d 370, 374 (Colo. 1981)).

[86] *Id*.

[87] *Id*. at 853 (citations omitted).

[88] Docket No. 93 at pg. 8.

with the ASME Code ultimately rested with the Debtors. Thus, this factor – by a close margin – favors Damarc.

Having considered the *Tunkl* factors in light of (1) the nature of the activity – namely, the construction of specialized, commerical pressure vessels; and (2) the nature of the injury – namely, pure economic loss from the non-compliant Tanker Trailers, the Court finds that the public interest exception does not render the Exculpatory Clause invalid.

### D.  Allocation of Risk Based on Cost of Services

An additional factor in enforcing an exculpatory clause is the cost of the services versus the potential liability. In *Markborough California, Inc. v. Superior Court*,[89] an engineer was paid $67,640 to designed a man-made lake. The lake leaked, and the engineer was sued for the $5 million in repair costs. In enforcing the exculpatory clause, the court noted that "it has been recognized that limitation of liability provisions is particularly important where the beneficiary of the clause is involved in a 'high-risk, low-compensation service.'"[90]

In this case, the Contract provided for a fee of $95 per hour,[91] and the Debtor paid Damarc a total of $18,573.80 for its inspection services.[92] Now the Trustee is seeking to recover $1,155,248.80 in damages from Damarc. This disparity between benefit and liability exemplifies the point made in *Markborough* that parties in complex construction projects may negotiate for the allocation of risk and loss in a contract, with that allocation being reflected in the price of the services. This factor again favors Damarc.

---

[89] *Markborough Cal., Inc. v. Superior Court*, 277 Cal. Rptr. 919, 925 (Cal. Ct. App. 1991).

[90] *Id*. at 925 (quoting *H.S. Perlin Co., Inc.*, *v. Morse Signal Devices of San Diego*, 258 Cal. Rptr. 1, 6 (Cal. Ct. App. 1989)).

[91] Docket No. 57, Exs. A & B.

[92] Docket No. 1, ¶ 62.

## V.  CONCLUSION

In summary, the risks of manufacturing a non-compliant MC-331 tanker are obvious given the copious and complex requirements of the ASME Code with its mandated materials, manufacturing techniques, inspections, and certification processes. Having qualified under ASME to construct the Tanker Trailers, the Debtor is deemed to have understood these requirements, the accompanying risks, and the consequences of non-compliance. While the ASME Code contemplates that an Authorized Inspector "shall [not] be liable in any manner for . . . a loss of any kind arising from or connected with this inspection,"[93] the Debtor had the opportunity to negotiate whether it or Damarc would bear the loss if the Tanker Trailers were ultimately unmarketable due to non-compliance with the ASME Code. As evidenced by the signed Contract, the Debtor assumed the risk of that loss. The Court will honor and enforce the terms of the Contract in general, and the Exculpatory Clause specifically, in granting summary judgment in favor of Damarc and dismissing the Trustee's third cause of action for breach of contract and the fourth cause of action for professional negligence.

The Court will enter an Order consistent with the rulings set forth in this Memorandum Decision.

_____END OF DOCUMENT_____

---

[93] Docket No. 57 at Ex. G "Form U-1 Manufacturer's Data Report For Pressure Vessels."

----oooOooo----

**DESIGNATION OF PARTIES TO RECEIVE NOTICE**

The foregoing MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOCKET NO. 57) shall be served on the following parties in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- William G. Garbina  wgarbina@cohnekinghorn.com, mcerutti@cohnekinghorn.com

- George B. Hofmann  ghofmann@cohnekinghorn.com,  dhaney@cohnekinghorn.com, jthorsen@cohnekinghorn.com

- David H. Leigh  dleigh@rqn.com, dburton@rqn.com, docket@rqn.com

- Richard C. Terry  richard@tjblawyers.com, cbcecf@yahoo.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

Michael A Steel
Brennan Manna & Diamond, LLC
The Carnegie Building
75 East Market St.
Akron, OH 44308